UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  10-61485-CIV-DIMITROULEAS

BANTA PROPERTIES, INC.,

      Plaintiff,

v.

ARCH SPECIALTY
INSURANCE COMPANY,

      Defendant.

_____/

# PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, STATEMENT OF DISPUTED MATERIAL FACTS, AND MEMORANDUM OF LAW

Gregory C. Ward, P.A.
Brian L. Lerner, P.A.
Jay Kim, P.A.
Ward Kim Vaughan & Lerner LLP
One Financial Plaza, Suite 2001
Fort Lauderdale, Florida 33394

Attorneys for Plaintiff Banta Properties, Inc.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... ii

I. INTRODUCTION ............................................................................................... iii

II. STATEMENT OF DISPUTED MATERIAL FACTS ...................................... iii

    A.    About Banta .................................................................................... vi

    B.    Hurricane Wilma Strikes South Florida
         And Significantly Damages The Properties .......................................... vii

    C.    The Work Performed By General Star and Banta ........................................ viii

III. MEMORANDUM OF LAW ............................................................................ 1

    A.    Legal Standards Governing This Motion ........................................... 1

         1.    Legal Standards Governing Summary Judgment ................................. 1

         2.    Legal Standards Governing A "Late Notice" Defense ......................... 1

    B.    Arch's "Late Notice" Defense Should Be Rejected Because
         When The Duty To Notify Arose Is A Disputed Material Fact ....................... 3

    C.    Arch's "Late Notice" Defense Should Be Rejected Because
         Banta Has Set Forth Facts to Show That Arch
         Was Not Prejudiced Creating A Fact Question for the Jury ............................ 5

         1.    Another Insurance Company Performed A Complete Investigation,
             And Arch Was Provided Access To This Complete Investigation ....... 6

         2.    Arch Had Access To Substantial Information Provided By
             Banta, Which Allowed Arch To Adjust The Claim .............................. 8

         3.    Competent Individuals Provided Comprehensive
             Information To Arch .............................................................................. 11

         4.    Arch Is Prohibited From Relying On Prejudice It Created .............. 12

    D.    Arch's Reliance On Its "No Action" Clause To
         Argue Banta Breached The Policy Is Unsupported ........................................ 14

IV. CONCLUSION ................................................................................................ 16

CERTIFICATE OF SERVICE ............................................................................. 17

SERVICE LIST ...................................................................................................... 17

## TABLE OF AUTHORITIES

**Page**

## CASES

*Anderson v. Liberty Lobby Inc.*,
477 U.S. 242 (1986)......................................................................................... 1, 3

*Bray v. Gillespie IX, LLC v. Hartford Fire Ins. Co.*,
2009 U.S. Dist. LEXIS 44585 (M.D. Fla. 2009) ............................................... 2

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)............................................................................................ 1

*De Leon v. Great Am. Assur. Co.*,
2011 Fla. App. LEXIS 16154 (Fla. 3d DCA 2011) ......................................... 10

*Hartford Accident and Indemnity Co. v. Mills*,
171 So. 2d 190 (Fla. 1st DCA 1965) .................................................................. 5

*Kroener v. Florida Ins. Guar. Ass'n*,
63 So. 3d 914, 916 (Fla. 4th DCA 2011) ........................................................... 4

*Mid-Continent Casualty Co. v. Basdeo*,
742 F. Supp. 2d 1293 (S.D. Fla. 2010) ......................................................... 6, 12

*Palma Vista Condo. Ass'n of Hillsborough Cty. v. Nationwide Ins. Co.*,
2010 U.S. Dist. LEXIS 118262 (M.D. Fla. 2010) ......................................... 6, 11

*Renuart-Bailey-Cheeely Lumber & Supply Co. v. Phoenix of Gartford Ins. Co.*,
474 F.2d 555 (5th Cir. 1972) .............................................................................. 4

*Robinson v. Auto Owners Ins. Co.*,
718 So. 2d 1283 (Fla. 2d DCA 1998) ............................................................. 5, 8

*Shotz v. City of Plantation*,
344 F.3d 1161 (11th Cir. 2003) .......................................................................... 1

*Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*,
674 F. Supp. 2d 1333 (S.D. Fla. 2009) ................................................... 1, 2, 3, 15

## STATUTES

28 U.S.C. § 1746........................................................................................................ iv

## RULES

Fed. R. Civ. P. 56(c) ................................................................................................... 1

Fed. R. Evid. 201 ................................................................................................... v, vi

# I. <u>INTRODUCTION</u>

Defendant Arch Specialty Insurance Company ("Arch") is an excess insurer with liability for hurricane losses between $2.5 million and $8.5 million experienced by Banta Properties, Inc. ("Banta").  Arch has moved for summary judgment based only on one defense:  late notice.  As demonstrated below, there is a fact question when the duty to notify arose—the day after Hurricane Wilma (as Arch contends), when Banta determined its damages exceeded the underlying insurance policy, or when the underlying insurer tendered policy limits.

Assuming Arch is correct that the duty to notify arose the day after Hurricane Wilma and Banta's notice was untimely, then Arch is merely entitled to a presumption of prejudice that Banta may then rebut.   Here, Banta has set forth sufficient record evidence to rebut any presumption because:  (1) Arch received the complete investigation made by the underlying insurance carrier; (2) Arch had access to substantial information provided by Banta (over 30,000 pages according to Arch); and (3) Arch received the results of complete investigations conducted by competent persons.

Finally, although not Banta's burden, Banta has demonstrated that Arch created the prejudice because, although receiving all of this information, Arch chose not to provide any of this information to its consultants for purposes of adjusting Banta's claim.  As such, Arch cannot benefit from a prejudice it created.  Accordingly, summary judgment must be denied because fact questions exist as to when notice was required, whether Arch was actually prejudiced by any delay, and whether Arch, in fact, caused any prejudice.

# II. <u>STATEMENT OF DISPUTED MATERIAL FACTS</u>

Any factual concessions made in Banta's Statement of Disputed Material Facts ("*Disputed Facts*") are made for summary judgment purposes only.

1. Not disputed as to the allegations of paragraph 1, including that Arch issued an excess policy, Policy No. ESP 0005727-00 (the "Arch Policy").  Banta, however, disputes the facts contained in the affidavit of Jon Wanczyk.

2. Not disputed that the Arch Policy provided coverage for excess damage of $8,503,732, and that Arch reprints one sentence (adding emphasis) of the Arch Policy.

3.      Not disputed that General Star Indemnity Company ("General Star") was the primary insurer, that General Star issued a policy in the amount of $2.5 million (the "General Star Policy"), and that Arch reprints portions (adding emphasis) of the General Star Policy. Banta further notes that the General Star Policy, as incorporated into the Arch Policy, also provides the following:

3.      **Duties In The Event Of Loss Or Damage**

a.      You **must** see that the following are done in the event of loss or damage to Covered Property:

…

(4)     Take all reasonable steps to protect the Covered Property from further damage….

[D.E. #82-3, p.24]

4.      Not disputed.

5.      Disputed.  Arch's corporate representative testified that a claim under the Arch Policy does not "accrue" until the underlying policy limits (that is, the General Star Policy) are tendered by the underlying carrier.  *See* Deposition of Arch Corporate Representative Jon Wanczyk, attached as Exhibit 1 ("*Arch Depo.*"), at 163:22-164:3.  General Star did not tender policy limits until March 2008.  Declaration of Cathie Banta, attached as Exhibit 2 ("*C. Banta Dec.*"), at ¶18.[1]  Banta provided notice only two days after General Star tendered policy limits and therefore provided timely notice.  *C. Banta Dec.* ¶19; *Disputed Facts* ¶7.

6.      Not disputed as the claim did not accrue under the Arch Policy until March 2008. *Arch Depo.* 163:22-164:3.

7.      Not disputed.

---

[1]      Declarations signed under penalty of perjury have the same effect as sworn affidavits and may be considered as evidence in support of summary judgment motions.  28 U.S.C. § 1746.

8.     Not disputed as to what is printed in the letter attached at D.E. #82-5.  Otherwise disputed.  It is unclear upon what date Arch claims to have begun its investigation.  *Disputed Facts* Part D.  Moreover, as is clear from the testimony from Arch and its consultants and set forth below, Arch did not commence a good faith investigation of Banta's claim upon receipt of Banta's letter.  *Disputed Facts* Part D.

9.     Not disputed as to what is printed in the letter attached at D.E. #82-6.

10.     Not disputed as to what is printed in the letter attached at D.E. #82-7.  Disputed as to the date of the contract, which provides the following:  "Signed this day, April 30, 2008." [D.E. #82-7, p.2]

11.     Not disputed as to what is printed in the letter attached at D.E. #82-8.  Otherwise disputed that any repair or replacements would constitute a breach of the Arch Policy.  As stated above, the General Star Policy, as incorporated into the Arch Policy, expressly provides that Banta "must see that the following are done in the event of loss or damage to Covered Property: . . . (4) [t]ake all reasonable steps to protect the Covered Property from further damage.  [D.E. #82-3, p.24]  Further, Florida law requires that Banta, as a landlord, maintain the properties such that all roofs, windows, screens, doors, floors, steps, porches, exterior walls, foundations, and all other structural components be maintained in good repair and capable of resisting normal forces and loads or otherwise be liable to the tenant for any such violations.  *C. Banta Dec.* ¶ 5; *see also* Fla. Stat. §§ 83.51(1), (2), (4).[2]

12.     Not disputed that that six of thirteen buildings covered by the Arch Policy had windows replaced and that the roofs were replaced after Hurricane Wilma.  Disputed as to Arch

---

[2]     The Court may take judicial notice of statutes.  Fed. R. Evid. 201.

characterizing June 18, 2008, as the first opportunity to inspect the loss. Arch could have inspected prior to that date, but June 18 was the first date all parties were available.

13.     Not disputed as to what is printed on the first page of the letter attached at D.E. #82-10. Disputed as to the amount of the proof of loss. The amount claimed under the Arch Policy was $8,503.732. [D.E. #82-10]   Further, Banta disputes the authenticity and completeness of the letter attached as D.E. #82-10. Banta does not dispute that the first two pages of D.E #82-10 were part of the original letter dated July 30, 2008, but the remaining forty-one pages were not part of the original letter.

14.     Banta objects to this paragraph as irrelevant, improper, and inadmissible settlement communications and requests that the Court strike this paragraph as improper disclosure of privileged and confidential settlement communications.

15.     Banta objects to this paragraph as irrelevant, improper, and inadmissible settlement communications and requests that the Court strike this paragraph as improper disclosure of privileged and confidential settlement communications.

16.     Not disputed.

## ADDITIONAL DISPUTED FACTS

### A.     About Banta

17.     Banta was and is a property management company. *C. Banta Dec.* ¶3. In that role, Banta did and continues to oversee the management of the three properties at issue in this insurance coverage dispute—Colonial Park, Parkcrest, and Westwood. *C. Banta Dec.* ¶3.

18.     Banta has been providing these management services at the three properties for more than two decades. *C. Banta Dec.* ¶3. This includes leasing the apartments, collecting the rents, and making sure that maintenance is done to the apartments. *C. Banta Dec.* ¶3. As the

management company in charge of these three properties, Banta is responsible for repairing any damages. *C. Banta Dec.* ¶3.

**B.**     **Hurricane Wilma Strikes South Florida And Significantly Damages The Properties**

19.     On October 24, 2005, Hurricane Wilma struck South Florida.  As reported by the National Weather Service (http://www.srh.noaa.gov/mfl/?n=wilma): (1) Broward County experienced category 2 hurricane conditions; (2) the eye of the hurricane covered most of Broward County; (3) the eye wall, the part of the storm with the strongest winds, affected virtually all of South Florida; (4) winds of 99 miles per hour were recorded at Fort Lauderdale Airport (a location near the properties in question); (5) the winds on the backside of the storm likely contributed to the heavier damage across Broward County; and (6) structural damage was heaviest in Broward County.[3]

20.     The three properties, like much of Broward County, suffered damage.  [D.E. #84-1 at 119:13-19]  Catherine Banta, who is a Banta employee and supervisor, as well as Banta's secretary and president, personally observed this damage immediately after the hurricane, having spent days doing this. *C. Banta Dec.* ¶¶4, 9-11.  Indeed, she personally inspected each of the nearly 250 apartments at the properties, took pictures of what she believed to be hurricane-related damage, and documented what she believed to be hurricane-related damage by taking notes as she walked each apartment. *C. Banta Dec.* ¶¶4, 9-11.

---

[3]     The Court may take judicial notice of what has been reported by the National Weather Services as the facts are generally known within the territorial jurisdiction of the Court and the facts are capable of accurate and ready determination by resort to a source whose accuracy cannot reasonably be questioned—the National Weather Service.  Fed. R. Evid. 201.

**C.**     **The Work Performed By General Star and Banta**

21.     Immediately after the hurricane, Banta notified its insurance agent at the John Galt Insurance Agency ("John Galt").  *C. Banta Dec.* ¶6.  Banta made a claim against what it knew as its only insurer, General Star.  *C. Banta Dec.* ¶6.

22.     In accordance with the General Star Policy and as required by state law, Banta took steps to repair damages impacting tenants.  *C. Banta Dec.* ¶¶5, 12.  This included repairing the leaking roofs, replacing damaged windows, and repairing other significantly damaged aspects of the properties.  [D.E. #82-3, p.24]; *C. Banta Dec.* ¶12; Fla. Stat.§§ 83.51(1), (2), (4).

23.     General Star did investigate the properties.  General Star hired an independent adjuster to assist with its investigation, Eastland Claim Service ("Eastland").  *See* Deposition of Thomas Donkerbrook, attached as Exhibit 3 ("*D'Brook Depo.*"), at 24:15-19.  Eastland also hired Woods Restoration Services ("Woods") to prepare damages estimates.  *D'Brook Depo.* 71:1-7.

24.     General Star took a further step during the course of Banta's claim and hired a second independent adjuster, D'Brook & Company, to review the work of Eastland and Woods and then inspect the properties again to look for any additional losses not noted by Eastland or Woods.  *D'Brook Depo.* 24:15-19, 44:10-44:15.  When D'Brook was hired, General Star and Banta provided D'Brook with 50-75 CDs of photographs and documentation supporting Banta's claim.  *D'Brook Depo.* 51:12.  D'Brook conducted additional inspections of the properties. *D'Brook Depo.* 44:10-44:15.  D'Brook noted that, in addition to photographs taken by Eastland and Banta, it also took "hundreds and hundreds" of additional photos over and above the photos already on the 50-75 CDs.  *D'Brook Depo.* 121:10-17.  D'Brook took pictures in every unit. *D'Brook Depo.* 115:11-25.

25.    In addition to Eastland, Woods, and D'Brook, General Star would hire a fourth consultant, Ed Williams Roof Consultants, LLC, to prepare a roof inspection report. [D.E. #72, ¶3]  And finally, General Star retained a fifth consultant, retaining Haag Engineering to investigate Banta's claim and to prepare a report. [D.E. #72, ¶3]  Haag Engineering "wrote an *extensive report containing numerous findings that are germane to the dispute between ARCH and the Plaintiff.*" [D.E. #85, p.8 (emphasis added)][4]  This report was part of the underlying General Star file and this report was given to Banta. *C. Banta Dec.* ¶17.

26.    In late September and mid-November 2007, Banta received cost estimates from its consultant, Jimerico Construction and Hunter R Contracting. *C. Banta Dec.* ¶15.  The cost estimates revealed for the first time that damages to the properties could be in excess of $10 million. *C. Banta Dec.* ¶17.

27.    On March 12, 2008, Banta and General Star reached a settlement. *C. Banta Dec.* ¶18.  General Star tendered policy limits of $2.5 million. *C. Banta Dec.* ¶18.

28.    D.    The Work Performed By Banta And Not Performed By Arch

29.    Immediately thereafter, Banta reported its claim for excess damages caused by Hurricane Wilma to Arch, including providing cost estimates. *C. Banta Dec.* ¶¶19, 20.  Banta supplied its Sworn Statement in Proof of Loss on a form substantially the same as the form used by Arch. *Arch Depo.* 45:19-22.  In fact, Arch admits that Banta completely filled out this form. *Arch Depo.* 45:23-46:1.  Arch further admits that if anything had been missing or not filled out on the proof of loss, Arch would have told Banta (which it did not do). *Arch Depo.* 46:2-5; *C. Banta Dec.* ¶21.

---

[4]    Arch's Statement of Undisputed Facts treats as the same communications from Arch and from its attorneys.  Moreover, Arch admitted in its deposition that its attorneys have the same responsibilities that Arch has in handling the claim of the insured. *Arch Depo.* 14:13-24.

30.     Arch admitted that it was *Arch's responsibility* to ask Banta for all the information it required in order to adjust the claim.  *Arch Depo.* 41:9-12.  Arch initially would request an exhaustive list of approximately thirty categories of documents and then another twenty-two categories.  *C. Banta Dec.* ¶22.  Arch's collective requests required Banta to produce over 30,000 pages of documents, including thousands of photographs and written summaries of damages observed in each unit as well as maintenance records and property assessments and inspection reports going back several years.  *C. Banta Dec.* ¶23; *see also* Arch's Answer [D.E. #7, ¶¶ 27, 28]  Arch requested photographs, a release for the General Star file, status of repairs, maintenance records, estimates, invoices, and receipts.  *Arch Depo.* 24:17-26:8, 26:14-23, 28:3-4, 33:16, 41:17-22, 52:5-10, 52:15-17, 78:13-20, 85:9-13, 154:21-155:18.  Banta provided all of this information.  *C. Banta Dec.* ¶¶23, 27; *D'Brook Depo.* 121:10-17.  Banta also sat for an examination under oath conducted by Arch on November 3, 2009.  *C. Banta Dec.* ¶25.  Banta was willing to resume the examination under oath immediately before and after it filed this lawsuit (offered to Arch on October 14, 2010), but Arch did not contact Banta to reschedule the remainder of the examination under oath.  *C. Banta Dec.* ¶25.  Given the comprehensive production, Arch is unaware of any other information it does not have or it would require to adjust Banta's claim, and Arch in fact "***may not need any additional information***."  *Arch Depo.* 66:8-66:13, 67:13-18.

31.     Arch testified that receiving the General Star file was its "main concern" in adjusting Banta's claim.  *Arch Depo.* 19:6-14.  Arch further admitted that the General Star file would provide Arch information on "where the insured was in terms of the status of their repairs what we would see when we went to inspect the facilities for the first time; what type of consultants the insured and/or General Star had used up to that point in time, and a copy of their

reports and any findings that they may have that would show the claim was in our layer or where it was at any dollar value." *Arch Depo.* 24:17-25:1. As detailed below Arch received the General Star file and then did virtually nothing with the file.

32.    In June 2008, Arch sent its retained consultants, Anthony Cinnamon of Wiss, Janney, Elstner Associates, Inc., and Trey Quelette of J.S. Held Incorporated to inspect the properties. Deposition of Anthony Cinnamon, attached as Exhibit 4 ("*Cinnamon Depo.*"), at 91:3-6; Deposition of Trey Quelette, attached as Exhibit 5 ("*Quelette Depo.*"), at 46:8-23. Mr. Cinnamon was the causation consultant and therefore the person to decide whether any claimed damages was caused by Hurricane Wilma. *Quelette Depo.* 46:16-43:2, 54:1-55:8, 136:17-24. Mr. Quelette was the cost estimator and therefore the person to put a price tag on any damage Mr. Cinnamon determined was hurricane related (since he is not qualified to make such a determination). *Quelette Depo.* 46:16-43:2, 54:1-55:8, 136:17-24.

33.    Arch's consultants, however, were given very narrow scopes of work. Mr. Cinnamon only looked at the windows, the facade, and accessible roof trusses. *Cinnamon Depo.* 76:23-77:6, 89:10-15. He was not to look at the interiors, ceiling damage, flooding damage, doors, mold, pool, pool decks, pool house, or patios. *Cinnamon Depo.* 89:10-90:3, 90:9-23. Mr. Quelette did not review any of the costs Banta incurred to make repairs—not one single invoice, which meant his investigation focused on pricing only those limited areas inspected by Mr. Cinnamon and determined by Mr. Cinnamon to be hurricane-related damage. *Quelette Depo.* 44:22-46:1, 77:18-24. Indeed, Mr. Quelette did not simply go through the exercise of taking every invoice that Banta submitted as claimed hurricane damage and calculate how much Banta spent. *Quelette Depo.* 151:9-16.

34.     Arch did not provide either Messrs. Cinnamon or Quelette a single document. *Cinnamon Depo.* 76:23-77:22; *Quelette Depo.* 44:13-15, 68:12-69:4.  These consultants did not interview anybody (Banta, tenants, code enforcement officials), review photographs, maintenance records, or prior property assessments, meet with lawyers, or even have any awareness that General Star or other consultants had adjusted the claim prior to Arch.  *Cinnamon Depo.* 102:11-19, 106:16-25, 128:9-129:2, 133:16-18, 134:19-135:7, 135:16-24, 136:22-137:7, 138:11-21, 140:6-9, 158:6-10, 167:2-9, 169:12-22, 181:2-3; *Quelette Depo.* 68:18-4, 77:18-24, 85:12-19, 117:20-118:16, 156:13-15 , 169:14-17.[5]  Tellingly, while Mr. Quelette was supposed to quantify damages, he in fact never prepared a cost estimate until July 2011—being specifically "told not to generate an estimate."  *Quelette Depo.* 42:16-43:14, 88:3-11.

---

[5]     When shown photographs, both consultants agreed they could determine that the photographs showed hurricane-related damage.  *Cinnamon Depo.* 169:12-22, 170:2-11, 172:8-15, 183:7-18; *Quelette Depo.* 93:3-94:2, 137:15-138:12, 155:19-156.

### III. <u>MEMORANDUM OF LAW</u>

A.      <u>Legal Standards Governing This Motion</u>

      1.      <u>Legal Standards Governing Summary Judgment</u>

A party moving for summary judgment must show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden of establishing the absence of a genuine issue of material fact lies with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is not appropriate unless it is clear that a trial is unnecessary. *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1333, 1336 (S.D. Fla. 2009) (citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986)). As this Court has recognized, any doubt in this regard must be resolved against the moving party. *See id.* (citations omitted).

Once the moving party makes a sufficient showing, the non-moving party must come forward with specific facts showing a genuine issue for trial. *See id.* (citations omitted). "In considering a motion for summary judgment, the Court must examine the evidence in the light most favorable to the non-movant and draw all inferences in his or her favor." *Anderson*, 477 U.S. at 255. If there is a conflict in the evidence, then the non-movant's evidence is to be believed and all reasonable inferences must be drawn in favor of the non-moving party. *Shotz v. City of Plantation*, 344 F.3d 1161, 1164 (11th Cir. 2003).

      2.      <u>Legal Standards Governing A "Late Notice" Defense</u>

Arch has moved for summary judgment citing only one ground: a purportedly late notice that gives rise to a presumption of prejudice.[6] To prevail on summary judgment based on late

---

[6]      Arch presents a second basis for summary judgment, claiming that Banta has violated the "no action" clause of the policy. Arch has cited no record evidence in support of this basis, and it has performed no analysis whatsoever on this issue. As such, this argument must be rejected.

notice, Arch must demonstrate when notice was provided, and then as a matter of law, that the notice given was untimely. *Vision I*, 674 F. Supp. 2d at 1338.

Where a court cannot determine "exactly when the duty to notify arose, the [c]ourt cannot determine that notice was untimely as a matter of law." *Id.* at 1339. The questions of whether an insured complied with a notice provision and what was a reasonable time to give notice under the surrounding circumstances usually are questions of fact. *See id.* at 1338 (citing *Bray v. Gillespie IX, LLC v. Hartford Fire Ins. Co.*, 2009 U.S. Dist. LEXIS 44585 (M.D. Fla. 2009)).

Courts addressing late notice look to the facts and circumstances of each case. *See Vision I,* 674 F. Supp. 2d at 1337-38 (citations omitted). Further, if the insured can provide some explanation for its noncompliance with the insurer's notice requirements, a fact question is presented for resolution by a jury. *See Vision I,* 674 F. Supp. 2d at 1340 ("Florida law is clear that while a total failure to comply with policy provisions made a prerequisite to suit under the policy may constitute a breach precluding recovery from the insurer as a matter of law, if the insured cooperates to some degree or provides an explanation for its noncompliance, a fact question is presented for resolution by a jury.").

If this Court determines that there are no disputed genuine issues of material fact regarding when notice should have been given *and further* concludes that Banta's notice was late as matter of law, then Arch only would be entitled to a *rebuttable* presumption of prejudice. Banta then may overcome this rebuttable presumption by setting forth sufficient facts to demonstrate that the insurer was not prejudiced. Once facts are identified that tend to show a lack of prejudice, any presumption arising as a result of late notice disappears and the issue of prejudice becomes a question of fact for the jury. *See Vision I,* 674 F. Supp. 2d at 1339.

**B.     Arch's "Late Notice" Defense Should Be Rejected Because**
<u>**When The Duty To Notify Arose Is A Disputed Material Fact**</u>

As stated above, the first step in analyzing a late notice defense is to determine, if possible, when the duty to notify arose.  As this Court has recognized, "'[a]bsent a finding as to exactly when the duty to notify arose, the [c]ourt cannot determine that notice was untimely as a matter of law,' precluding the granting of summary judgment on the issue of late notice." *Vision I,* 674 F. Supp. 2d at 1339 (citations omitted).

A fact question is presented in the instant case as to when Banta should have given notice because it is impossible to determine from the record "exactly when the duty to notify arose." Arch suggests that notice was proper as of the day of the hurricane.  Arch cites no record evidence to support its claim that Banta somehow knew the day after Hurricane Wilma that the extent of the damage from Hurricane Wilma exceeded $2.5 million, the policy limits of the General Star Policy.[7]

Under the Arch Policy, a factual issue exists implicating at least *three* possible dates that Banta could have been required to give notice to Arch.  The earliest date is used by Arch in its motion, namely, immediately after Hurricane Wilma.  This contention is unsupported by any record evidence as already demonstrated.

Giving Arch the benefit of the doubt (which of course is not permitted on summary judgment), the record possibly could suggest a second date occurring twenty-three months after Hurricane Wilma, when Banta received cost estimates suggesting damages exceeding $10

---

[7]     Arch's sole evidence is based on inferences and assumptions.  [D.E. #83, p.8 ("Plaintiff *should have known* that it would be seeking excess coverage under the ARCH policy'"; "Plaintiff also *should have known* that ARCH would want to participate and/or be kept informed of the primary carrier's claim investigation." (emphasis added))]  What Banta knew or should have known and when Banta knew it are fact questions within the discretion of the jury.  Even if true, Arch asks this Court to decide a summary judgment motion based on inferences, which of course it cannot do as such inferences are construed against Arch and in favor of Banta.  *Anderson*, 477 U.S. at 255.

million.  *Disputed Facts* ¶26.  The record is silent as to any proof that Banta had any knowledge regarding the need to notify the excess carrier until Jimerico provided its estimate to Banta.  In fact, Banta did not have accurate estimates of the complete scope of damage prior to these dates. *Disputed Facts* ¶26.

Finally, and as supported by record evidence, Banta could have given notice on a third date, namely the date that the claim against Arch accrued.  It is undisputed by Arch that a claim under the Arch Policy does not "accrue" until the underlying policy limits are tendered by the underlying carrier.  *Arch Depo.* 163:22-164:3.

Notwithstanding its own admission and notwithstanding its reliance solely on inferences of what Banta should have known, Arch goes on to argue that "providing notice to an insurer over two years and two months after a hurricane loss violates the notice provision of an insurance policy."  [D.E. #83, p.7 (citing *Kroener v. Florida Ins. Guar. Ass'n*, 63 So. 3d 914, 916 (Fla. 4th DCA 2011)]  However, Arch's reliance on *Kroener* is misplaced.  *Kroener* did not involve an excess insurer as the case here, and did not involve insureds who presented extensive information as was presented to Arch.  *See* discussion *infra* Part III.C.  The plaintiffs in *Kroener* were third-party buyers of a hurricane-damaged home, who asserted a claim for damage occurring prior to their purchase of the home.  The court noted that a third-party buyer is not entitled to assert a claim where the original seller did not present a claim when the damage occurred.  *See id.* at 916.

Arch's suggestion that *Kroener* creates an arbitrary time bar is incorrect.  *See, e.g.*, *Palma Vista*, 2010 U.S. Dist. LEXIS 118262 at *7 (*citing Renuart-Bailey-Cheeely Lumber & Supply Co. v. Phoenix of Gartford Ins. Co.*, 474 F.2d 555, 557-58 (5th Cir. 1972)).  "Florida does not have such a *per se* time rule but instead grounds each decision on the facts and circumstance of the

particular case." *Renuart-Bailey-Cheeely Lumber & Supply Co.*, 474 F.2d at 558 (noting that under Florida law a four-year delay in notice presented a question for the jury).

Because Arch admits that a claim does not accrue until the underlying carrier tenders policy limits (which occurred only two days before Banta gave notice to Arch) and because giving Arch the benefit of the doubt the evidence shows that Banta did not know the full extent of its damages exceeding the underlying insurance policy until six months before it gave notice to Arch, it is impossible to determine, as a matter of law, the exact date when notice was required. Accordingly, there exists a fact question of when notice was proper and thus summary judgment must be denied.

### C.    Arch's "Late Notice" Defense Should Be Rejected Because Banta Has Set Forth Facts to Show <u>That Arch Was Not Prejudiced Creating A Fact Question for the Jury</u>

Even if somehow Arch has established that Banta provided late notice, that does not end the analysis.  Rather, Arch becomes entitled to a rebuttable presumption of prejudice.  With regard to rebutting this prejudice, Florida courts recognize several circumstances where an insured would be able to rebut an insurer's claim of prejudice based on late notice.

*First*, an insured may rebut prejudice where "a complete investigation was made by another insurer…." *Hartford Accident and Indemnity Co. v. Mills*, 171 So. 2d 190, 195 (Fla. 1st DCA 1965).  *Second*, where an insurer has access to "substantial information" provided by the insured, "it cannot be said that the record on motion for summary judgment conclusively foreclose[s] [the insured's] ability to overcome the presumption [of] late notice." *Robinson v. Auto Owners Ins. Co.*, 718 So. 2d 1283, 1284-85 (Fla. 2d DCA 1998) (reversing summary judgment in favor of an insurer on late notice where insurer was notified of accident four years after it occurred).  *Third*, an insured may rebut prejudice where "competent persons" made a "complete investigation" and then turned over the results to the insurer.  *See, e.g.*, *Mills*, 171

So. 2d at 195; *see also Palma Vista Condo. Ass'n of Hillsborough Cty. v. Nationwide Ins. Co.*, 2010 U.S. Dist. LEXIS 118262 (M.D. Fla. 2010) (*citing Robinson* and holding that summary judgment was improper where insurer was provided with engineering reports, documentation of damage, and the repairs that were performed).  *Fourth*, and very importantly, an insurer "cannot create a prejudice and thereby benefit from it."  *Mid-Continent Casualty Co. v. Basdeo*, 742 F. Supp. 2d 1293, 1338 (S.D. Fla. 2010).

As detailed below, each of these exceptions applies in the present case giving rise to fact questions defeating Arch's motion:  (1) a complete investigation was made by General Star (including having at least five outside consultants document damage, investigate damage, and issue reports) and Arch received the documents from General Star related to that investigation; (2) Banta itself provided Arch with "substantial information" in support of its claim, including over 30,000 pages of photographs, reports, cost estimates, contractors bids, maintenance records, and invoices and payments for repairs; (3) numerous "competent" individuals (including adjusters for both Banta and General Star) as well as Arch investigated Banta's claim and all of this information was received by Arch; and (4) Arch cannot rely on a prejudice it has created itself because it narrowly limited the inspections of the properties by its adjuster and consultants and did not provide its consultants (who Arch now claims are its expert witnesses in this case) with any of the "substantial information" compiled by General Star or by Banta, which included "hundreds and hundreds" of photographs of "each unit" and detailed reports of damages.  As such, a factual question exists if any prejudice is of Arch's own making.

### 1.    Another Insurance Company Performed A Complete Investigation, And Arch Was Provided Access To This Complete Investigation

General Star, the underlying insurer, had a policy for the same losses covered by the Arch Policy.  *Disputed Facts* ¶3.  The Arch Policy was the excess policy over the General Star Policy.

*Disputed Facts* ¶2.   General Star ultimately paid its policy limits of $2.5 million to Banta following a confidential pre-suit mediation.  *Disputed Facts* ¶¶7, 27.

Prior to mediation, General Star had conducted an investigation spanning several months and including numerous inspections through its adjusters and consultants.  *Disputed Facts* ¶¶23-25.  During the course of the General Star investigation, General Star hired five consultants, including one consultant (D'Brook) to review the work of the other consultants to look for any additional losses not noted by those other consultants.  *Disputed Facts* ¶¶23-25.  When D'Brook was hired, General Star and Banta provided D'Brook with 50-75 CDs of photographs and documentation supporting Banta's claim.  *Disputed Facts* ¶24.  D'Brook conducted an extensive inspection of the properties, took "hundreds and hundreds" of additional photos over and above the photographs already on the 50-75 CDs, and took photographs in every unit.  *Disputed Facts* ¶¶24.

Among the five consultants retained was Haag Engineering.  *Disputed Facts* ¶25.  Haag Engineering "wrote an *extensive report containing numerous findings that are germane to the dispute between ARCH and the Plaintiff.*"  *Disputed Facts* ¶25.  This report was part of the underlying General Star file, which Arch received.  *Disputed Facts* ¶25.  Notably, demonstrating the apparent reliability of this work product, Arch now seeks to rely on the Haag Engineering report at trial and to retain Haag Engineering as its own testifying expert witness.  [D.E. #85]

Arch admitted that receiving the General Star file was its "main concern" in adjusting Banta's claim.  *Disputed Facts* ¶30.  Arch further admitted that the General Star file would provide Arch information on "where the insured was in terms of the status of their repairs what we would see when we went to inspect the facilities for the first time; what type of consultants the insured and/or General Star had used up to that point in time, and a copy of their reports and

any findings that they may have that would show the claim was in our layer or where it was at any dollar value." *Disputed Facts* ¶30.  Arch ultimately received to the General Star file and then did virtually nothing with it as described below.  *Disputed Facts* ¶33.

As set forth *supra*, General Star compiled summaries, documented damage with extensive photographs, retained adjusters and consultants to adjust the claim, and interview witnesses, among other things.  Viewing the foregoing record evidence in the light most favorable to Banta, Banta has established that another insurer fully adjusted the claim.  Under Florida law, these facts alone are sufficient to overcome any purported prejudice alleged by Arch.

> **2.     Arch Had Access To Substantial Information
>          Provided By Banta, Which Allowed Arch To Adjust The Claim**

*Robinson v. Auto Owners Insurance Co.* sets forth a second method to overcome any purported "late notice" prejudice.  Where an insurer has access to "substantial information" provided by the insured, summary judgment is inappropriate and a fact question of prejudice remains.  *Robinson*, 718 So. 2d at 1285.  Here, in addition to the "substantial information" contained in the General Star file, Banta provided Arch with additional "substantial information" including all information requested by Arch during its investigation.  *Disputed Facts* ¶29.

Arch outlined the information it needed to adjust the claim in light of any alleged late notice.  Arch admitted that it was *Arch's responsibility* to ask Banta for all the information it required in order to adjust the claim.  *Disputed Facts* ¶29.  The following is a short summary of what Arch claimed in deposition it needed to adjust Banta's claim:

| INFORMATION ARCH ADMITS IT SHOULD RELY ON TO ADJUST THE BANTA CLAIM | INFORMATION PROVIDED BY BANTA |
|---|---|
| Photos.   *Disputed Facts* ¶29. | Yes.   Banta provided hundreds of pictures to Arch.   Banta also provided hundreds of pictures to General Star.  General Star and its adjusters recognized the thousands of photos and also created "hundreds and hundreds" of additional pictures. *Disputed Facts* ¶¶24, 29. |
| General Star file. *Disputed Facts* ¶29. | Yes.  *Disputed Facts* ¶29. |
| Status of repairs at the time the claim was presented to Arch.  *Disputed Facts* ¶29. | Yes. Banta produced contractor bids, invoices, and evidence of payment for hurricane-related repairs.  *Disputed Facts* ¶29. |
| Copies of General Star consultant reports. *Disputed Facts* ¶29. | Yes.   Banta has some of these reports in its possession and produced them, along with a release of the General Star file, to Arch. *Disputed Facts* ¶29. |
| Maintenance history prior to the date of loss. *Disputed Facts* ¶29. | Yes.   Banta produced hundreds-and-hundreds of pages of individual work orders and maintenance history logs.  *Disputed Facts* ¶29. |
| All records and details from the date of the occurrence and/or before up to the date of settlement with Gen Star.  *Disputed Facts* ¶29. | Yes.  *Disputed Facts* ¶29. |
| Inspection of the properties.   *Disputed Facts* ¶29. | Yes.  Arch asked to inspect the properties once, which occurred in June 2008.  *Disputed Facts* ¶29.  Arch was not restricted in any way and had full access.  *Cinnamon Depo.* 106:16-25, 163:22-164:7; *Quelette Depo.* 47:17-48:2. |
| Statements of the insured.   *Disputed Facts* ¶29. | Yes.  *Disputed Facts* ¶29. |
| Billing records for what Banta paid to repair things.  *Disputed Facts* ¶29. | Yes.  Arch received bank records, credit card receipts, other receipts showing payment, and cancelled checks.  *Disputed Facts* ¶29. |
| Estimates of Banta's experts and the related invoices to the actual work that was done. *Disputed Facts* ¶29.. | Yes.  Arch received cost estimates as well as three reports prepared by a structural engineer. *Disputed Facts* ¶29. |

| INFORMATION ARCH ADMITS IT SHOULD RELY ON TO ADJUST THE BANTA CLAIM | INFORMATION PROVIDED BY BANTA |
|---|---|
| Receipts.  *Disputed Facts* ¶29. | Yes.  *Disputed Facts* ¶29. |
| Invoices.  *Disputed Facts* ¶29. | Yes.  *Disputed Facts* ¶29. |
| Examination Under Oath.  *Disputed Facts* ¶29. | Yes.  *Disputed Facts* ¶29.[8] |

Arch received everything it asked from Banta before the filing of the instant lawsuit, including an exhaustive list of approximately thirty categories of documents initially required by Arch and then another twenty-two categories identified after Banta's EUO.  *Disputed Facts* ¶29. Arch's collective requests required Banta to produce over 30,000 pages of documents, including thousands of photographs and written summaries of damages observed in each unit as well as maintenance records and property assessments and inspection reports going back several years. *Disputed Facts* ¶29.

Not surprisingly, Arch is unaware of any other information it does not have or it would require to adjust Banta's claim, and in fact "***may not need any additional information***."

---

[8]     Arch may complain that the examination under oath was not completed.  The first examination would have been considered improper by at least one Florida appellate court.  *See De Leon v. Great Am. Assur. Co.*, 2011 Fla. App. LEXIS 16154 (Fla. 3d DCA 2011) (noting that it is improper under Florida law for an insurance company to ask extensive questions in an EUO *unrelated* to the merits of a claim).  Here, Arch spent hours interrogating Banta about ownership interests, spending little time discussing the merits of the claim.  Further, after receiving all requested information, Arch simply refused to reschedule Banta's examination under oath for another three months, despite requests from Banta to continue.  Finally, sixty days after Banta filed a Civil Remedy Notice stating that Arch failed to reschedule the examination under oath, Arch unilaterally scheduled Banta's examination under oath *another 60 days later*.  In any event, even after the instant lawsuit, Banta was willing to continue the EUO, but Arch took no steps to re-schedule the EUO after Banta's last correspondence.  *Disputed Facts* ¶29.

*Disputed Facts* ¶29.  Clearly, Arch cannot argue as a matter of law it was prejudiced given the admission that *it "may not" need anything else to adjust Banta's claim.*[9]

In light of the extensive photographs, documents, statements, receipts, and maintenance records Banta provided to Arch in the context of Arch's foregoing admission that the information presented to it may have been sufficient to adjust the claim, the presumption of prejudice has been rebutted.  At a minimum, Banta has set forth sufficient facts to give rise to a fact question regarding prejudice.  Accordingly, summary judgment must be denied.

> **3.**     **Competent Individuals Provided Comprehensive Information To Arch**

As described in *Palma Vista Condo. Ass'n of Hillsborough Cty. v. Nationwide Ins. Co.*, 2010 U.S. Dist. LEXIS 118262 (M.D. Fla. 2010) summary judgment is improper where an insurer is provided with engineering reports, documentation of damage and the repairs that were performed prior to notice.  Numerous "competent" individuals turned over information and reports to Arch related to and/or in support of Banta's claim.

Prior to the instant lawsuit, Arch had received reports and information from of its own investigators/experts, General Star's five adjusters, consultants, and/or experts, and Banta's adjusters, engineers, and consultants.  *Disputed Facts* ¶¶23-25.  Arch admits that all of this was created by competent individuals and all of which helped Arch to adjust the claim.  *Disputed Facts* ¶29 and n.5.  In fact, Arch now seeks to retain General Star's professional engineer Haag Engineering to testify on Arch's behalf as an expert witness.  [D.E. #85, p.3]  This fact alone demonstrates that Arch received information from competent individuals.  Further, as described above, Arch received all receipts for repairs and maintenance records showing repairs made prior

---

[9]     To the extent Arch will argue it requires information regarding the "general interest of property ownership and how funds were disbursed after payment was received from GenStar," such an argument carries no weight.  *Arch Depo.* 213:18-23.  This is not the type of information Arch actually needed to adjust Banta's claim.  *See De Leon*, 2011 Fla. App. LEXIS 16154.

to and after the hurricane.  *Disputed Facts* ¶29.  Although Arch chose not provide its consultants with this information, when shown this information at deposition, this information was considered helpful.  *Disputed Facts* ¶¶29 n.5, 32, 33.

Arch, however, claims that it was prejudiced because its experts and consultants were unable to make inspections.   Yet somehow, *Arch's experts are now able to conclusively determine that all damage, but for a few pieces of stucco on one building, was not hurricane related but rather the result of wear-and-tear or poor maintenance.*  [D.E. #56-1, pp.6-7]  Had Arch come to this lawsuit claiming that it was incapable of determining the cause or extent of Banta's damages because of late notice, perhaps the defense should apply.  Instead, Arch claims on the one hand that it can prove that the damages alleged were not caused by Hurricane Wilma and/or are not as extensive as alleged but then inconsistently claims that it was prejudiced because it did not have access to inspect the premises immediately after the hurricane. Inconsistency notwithstanding, Arch received competent information from several sources thereby giving rise to a fact question regarding any prejudice allegedly suffered by Arch.

### 4.   Arch Is Prohibited From Relying On Prejudice It Created

Lastly, as stated above, an insurer "cannot create a prejudice and thereby benefit from it." *Basdeo*, 742 F. Supp. 2d at 1338.  Despite the significant amounts at stake and the extensive damages claimed by Banta, Arch instructed its consultants to narrowly focus their inspection of the properties.  For example, Arch only instructed its causation investigator (who is now its expert witness) to do a visual inspection of the facade, windows, and roofs.  *Disputed Facts* ¶32. Arch did not instruct, nor did Mr. Cinnamon perform any of the following:

| WORK NOT PERFORMED BY ARCH | |
|---|---|
| Interviews of witnesses, tenants, or Banta representatives. | No. *Disputed Facts* ¶32. |

| WORK NOT PERFORMED BY ARCH | |
|---|---|
| Inspection of the interiors of the apartment units. | No. *Disputed Facts* ¶32. |
| Inspection of ceiling damage. | No. *Disputed Facts* ¶32. |
| Inspection of flooding. | No. *Disputed Facts* ¶32. |
| Inspection of doors. | No. *Disputed Facts* ¶32. |
| Inspection of mold. | No. *Disputed Facts* ¶32. |
| Inspection of pool decks. | No. *Disputed Facts* ¶32. |
| Inspection of pool house. | No. *Disputed Facts* ¶32. |
| Visual inspection of water damage in units where windows had been replaced. | No. *Disputed Facts* ¶32. |

Incredibly, despite obtaining the General Star file and requiring Banta to produce over 30,000 pages of documents, Arch did not provide to its consultants-now-testifying-experts any of these documents. *Disputed Facts* ¶¶32, 33.  The following is a summary of some of the items Arch's consultants-now-testifying-experts never received or looked at, despite Arch having this information:

| INFORMATION ARCH HAD IN ITS POSSESSION PRIOR TO BANTA FILING THIS ACTION | INFORMATION ARCH DID NOT PROVIDE TO ITS EXPERT |
|---|---|
| General Star file. | Never heard of General Star.  *Disputed Facts* ¶33. |
| General Star's windows expert report. | Never heard of Haag Engineering and was unaware of another engineering company that looked at the windows.  *Disputed Facts* ¶33. |
| Photographs, invoices, contracts, or information about roof damage and replacement of roofs. | No.  *Disputed Facts* ¶33. |
| Photographs in general. | Did not recall asking for but would have liked to have seen photos.  *Disputed Facts* ¶33. |

| INFORMATION ARCH HAD IN ITS POSSESSION PRIOR TO BANTA FILING THIS ACTION | INFORMATION ARCH DID NOT PROVIDE TO ITS EXPERT |
|---|---|
| Maintenance records of Banta. | Did not ask Arch for maintenance records although basing conclusions of poor maintenance. *Disputed Facts* ¶33. |
| Property condition assessment reports of the properties. | No. *Disputed Facts* ¶33. |
| Any documents whatsoever. | In connection with developing its expert opinions in the case and at all times prior to deposition received, "[n]o documents and no, no background" from either J.S. Held or Arch. *Disputed Facts* ¶33. |

In this case, the substantial record evidence demonstrates that fact questions exist as to whether Arch was actually prejudiced, and if so, whether that prejudice was of Arch's own creation. In light of the extensive record evidence set forth above, this Court cannot resolve this analysis without weighing the facts presented and resolving factual disputes. As such, Arch's motion for summary judgment must be denied.

**D.     Arch's Reliance On Its "No Action" Clause To Argue Banta Breached The Policy Is Unsupported**

In one paragraph of string citations, Arch claims that Banta failed to comply with the "no action" clause of the Arch Policy because Banta filed suit "before fully complying with the notice provision of the policy." Without reference to any undisputed facts upon which this Court can rely, this argument should be summarily rejected. No doubt this argument has been inserted by Arch as a "place holder" so that Arch may present an unrebutted parade of horribles attempting to demonstrate Banta's purported failure to comply with the conditions of the Arch Policy (and thereby preventing Banta from offering any response in opposition). Interestingly, in deposition when Arch was asked for the factual support for its contention that Banta violated the

14

"no action" clause, Arch made no reference to any inadequacy of "notice."  *Arch Depo.* 154:17-
158:7.

Notwithstanding the complete absence of any factual or legal analysis whatsoever by
Arch, suffice it to say, Banta disputes that it failed to comply with this provision.  Presumably,
Arch will rely on paragraph 15 of its statement of undisputed facts wherein it alleges that Banta
failed to submit a complete and accurate Sworn Statement in Proof of Loss and supporting
documentation.  The documentation supplied by Banta has been addressed *supra*.

As for the proof of loss, Banta disputes that it failed to submit a complete and accurate
Sworn Statement in Proof of Loss.  In support of its Sworn Statement in Proof of Loss, Banta
already had provided cost estimates.  *Disputed Facts* ¶28.  At that time, Banta had already sent
Arch numerous CDs containing photos, summaries, and other information supporting Banta's
claim.  *Disputed Facts* ¶29.  Banta supplied its Sworn Statement in Proof of Loss on a form
substantially the same as the form used by Arch.  *Disputed Facts* ¶28.

Arch admits that Banta completely filled out this form.  *Disputed Facts* ¶28.  Arch admits
that if anything had been missing or not filled out on the proof of loss, Arch would have told
Banta (which it did not do).  *Disputed Facts* ¶28.  Arch also admits that if it required anything
specific of Banta, it was Arch's obligation to tell Banta specifically what it required.  *Disputed
Facts* ¶28.

Where an insured offers a reasonable explanation for any failure to comply or partly
complied with an insurer's request, a fact question is presented.  *Vision I,* 674 F. Supp. 2d at
1340.  Here, although Banta disputes that it failed to comply with any conditions of the Arch
Policy but rather that it fully complied, there is at worst, factual questions remaining as to this
issue.  Accordingly, summary judgment must be denied.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Banta respectfully requests that this Court deny Arch's Motion for Summary Judgment.

Dated:  November 7, 2011                            Respectfully submitted,

                                                    s/Gregory C. Ward, P.A.
                                                    Gregory C. Ward, P.A. (Fla. Bar No. 185949)
                                                    gward@wardkim.com
                                                    Brian L. Lerner, P.A. (Fla. Bar No. 177202)
                                                    blerner@wardkim.com
                                                    Jay Kim, P.A. (Fla. Bar No. 137863)
                                                    jkim@wardkim.com
                                                    Ward Kim Vaughan & Lerner LLP
                                                    One Financial Plaza, Suite 2001
                                                    Fort Lauderdale, Florida 33394
                                                    Telephone:     (954) 527-1115
                                                    Facsimile:     (954) 527-1116
                                                    *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 7, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that a true and correct copy of the foregoing document was served via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing on all counsel or parties of record on the Service List below.

s/Gregory C. Ward, P.A.<u>             </u>

## <u>SERVICE LIST</u>

Gregory C. Ward
gward@wardkim.com
Brian L. Lerner
blerner@wardkim.com
Jay Kim, P.A.
jkim@wardkim.com
Ward Kim Vaughan & Lerner LLP
One Financial Plaza
100 SE Third Avenue, Suite 2001
Fort Lauderdale, Florida 33394
Telephone:     (954) 527-1115
Facsimile:     (954) 527-1116
*Attorneys for Plaintiff*

Via Transmission of Notices of Electronic
Filing Generated by CM/ECF

Lauren D. Levy
llevy@butlerpappas.com
Butler Pappas Weihmuller Katz Craig LLP
80 SW 8th Street
Suite 3300
Miami, Florida 33130
Telephone:     (305) 416-9998
Facsimile:     (305) 416-6848
*Attorneys for Defendant*

Via Transmission of Notices of Electronic Filing
Generated by CM/ECF