# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  10-61485-CIV-DIMITROULEAS

BANTA PROPERTIES, INC.,

        Plaintiff,

v.

ARCH SPECIALTY
INSURANCE COMPANY,

        Defendant.
_____/

**DECLARATION OF CORPORATE REPRESENTATIVE OF BANTA
PROPERTIES, INC., IN SUPPORT OF PLAINTIFF'S RESPONSE IN
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
STATEMENT OF DISPUTED MATERIAL FACTS, AND MEMORANDUM OF LAW**

1.      My name is Catherine Banta and I am an employee and supervisor as well as the secretary and president of Banta Properties, Inc. ("Banta").  I held these positions with Banta at the time of Hurricane Wilma (the "hurricane") and at all relevant times thereafter.

2.      The information set forth in this declaration is based on my personal knowledge and based on my review of Banta's documents kept in the normal course of business.

3.      Banta is a property management company.  In connection with my employment with Banta, I oversee the management of the three properties at issue in this case:  Colonial Park; Parkcrest; and Westwood.  Banta has been providing these management services at the three properties for more than two decades.  This includes leasing the apartments, collecting the rents, and making sure that maintenance is done to the apartments.  As the management company in charge of these three properties, Banta is responsible for repairing any damages.

4.      After the hurricane, I was responsible for overseeing the repair work and acting as a liaison with the insurance companies, General Star Indemnity Company ("General Star") and Arch Specialty Insurance Company ("Arch") and their representatives.

### Insurance Policies, Terms And Law Related To Apartment Rentals

5.      As a landlord, Banta has certain obligations it must follow with respect to its tenants. Florida Statutes Section 83.51 requires that Banta comply with all building codes and maintain the properties such that all roofs, windows, screens, doors, floors, steps, porches, exterior walls, foundations, and all other structural components be maintained in good repair and capable of resisting normal forces and loads or otherwise be liable to the tenant for any such violations.  If a hurricane damages an apartment unit, as was the case with Hurricane Wilma, then Banta has to repair the unit as soon as possible so that the unit remains habitable.  This not only is necessary to protect the health of the tenant, but also to protect the safety of the tenant from crime.

### Notice To General Star

6.      Banta notified its insurance agent John Galt Insurance Agency ("John Galt") of a claim resulting from the hurricane.  Banta made a claim against what it knew as its only insurer, General Star.  I later would learn that not only was John Galt the insurance agent for General Star, but also for Arch.

7.      At the time Banta notified General Star, Banta did not know of, nor did it possess, a comprehensive estimate of damages.

### Banta's Inspections And Documentation Of Damage Immediately After Hurricane Wilma

8.      Banta conducted extensive inspections of the properties over the following weeks (and following years).

9.      I personally conducted these inspections and personally observed the damage immediately after the hurricane.  I personally inspected each of the nearly 250 apartments at the

properties.  I photographed what I believed to be hurricane damage.  I also compiled a list of all hurricane-related damage as I walked each unit.

10.     My inspection spanned many days and was based on my knowledge of the condition of the units prior to the hurricane.  My inspection also was based numerous complaints from tenants regarding damage occurring to their apartment because of the hurricane.  For example, immediately after the hurricane, tenants complained about water leaking in their apartments through the ceilings and around the windows.

11.     While inspecting each unit, I observed the ceilings, windows, doors, and carpet.  I personally observed windows that were blown out by the hurricane, windows that could fall off if pushed on, windows that would not close properly, trees that had fallen including on the roof at Parkcrest, apartments that were under water and with water running down the walls, and roof leaks from roofs that had not leaked prior to the hurricane.

12.     To protect the tenants and to prevent further damage to the apartments, Banta took steps to repair some of the hurricane-related damage.  Banta kept receipts of all work done to repair or replace any item damaged by the hurricane.  Further, Banta kept copies of maintenance logs prior to and after the hurricane.  And Banta kept copies of all bids and contracts entered into to repair the damage caused by the hurricane.

13.     All of Banta's photographs, notes, bids, contracts, invoices, and receipts, among other documents were turned over to General Star prior to General Star tendering its policy limits.

## Banta's Retention Of Adjusters, Consultants, And Contractors And Documentation Of Damage

14.     In addition to the work I did, Banta retained a public adjuster to investigate and document any damage caused by the hurricane.  I personally assisted the public adjuster in his

inspection of each unit in which he documented the damage.   All of the public adjuster's information, including photographs, was turned over to General Star.

15.    Banta also retained Jimerico Construction ("Jimerico") and Hunter R Contracting ("Hunter R") to investigate and document hurricane-related damages and to calculate estimates to repair the hurricane-related damage.   I again assisted in this process, which included Jimerico and Hunter R inspecting the properties and taking photographs.   On or about September 25, 2007, Jimerico provided Banta with an estimate of damages of $10,259,412.81 for total repairs, excluding windows.   On November 12, 2007, Hunter R provided Banta with an estimate of damages of $1,762,653.09 for window replacement.   This was the first time Banta received a formal estimate showing damages in this amount.

16.    These estimates, together with photographs and reports prepared by an engineer, were submitted to General Star prior to General Star tendering its policy limits.

17.    In addition, General Star provided to me certain reports done by their consultants.   I would later provide copies of these reports to Arch, one of which was a report by Haag Engineering.

### Confidential Pre-Suit Mediation And Settlement With General Star

18.    On March 12, 2008, General Star agreed to tender its policy limits during a confidential pre-suit mediation.   General Star has informed Banta that it has invoked the confidentiality provisions of the mediation, but has agreed to admit that it tendered the policy limits of its policy.

### Notice To Arch

19.    Banta notified Arch of its claim on March 14, 2008.   Banta was represented by counsel during this period of time and our counsel provided the actual notice of the claim to Arch. At that time, Banta provided to Arch a summary of its damages.

20.     Shortly thereafter, Banta would provide to Arch what I understand to be thirteen discs containing estimates and photographs of damage to the properties.  I understand the data on the discs amounted to over 8,000 pages.

21.     Thereafter, Arch requested that Banta complete a Sworn Proof of Loss (a copy of the blank form, which was just one page (front only) was provided with Arch's request).  Banta filled out the Sworn Proof of Loss and submitted it to Arch on July 30, 2008.  Arch did not tell Banta that anything was missing or not filled out on the Sworn Proof of Loss.

22.     In addition to the Sworn Proof of Loss, Arch requested that Banta provide the following categories of documents:

1.   The original insurance contracts issued by Arch to you, including all applicable endorsements and declaration page(s).
2.   Copies of your income tax returns for 2003, 2004 and 2005.
3.   All photographs or videotapes of the damaged property that is the subject of your claim, both before and after to the purported loss.
4.   All receipts, invoices, estimates, contracts, change orders, bids, agreements, canceled checks, etc., concerning any repairs, performed or contemplated, to the insured premises (including all aspects of each buildings) for the past five (5) years.
5.   All maintenance records for repairs, renovations or otherwise, performed on the insured premises for the past five (5) years including, but not limited to, records regarding exterior and interior wok to the common areas [note: this includes any in-house repairs or maintenance done].
6.   Any all documents or records concerning the roofs on all the buildings at the insured property including but not limited to warranties, installation invoices, or other papers, repairs, maintenance or replacement(s) [note: there is not time limitation on this request]
7.   All other policies of insurance, insuring any aspect of this loss, including but not limited to the individual units and the Association property, during the effective dates of the Arch policy of insurance.  If the originals of the policy is not available, please provide copies.
8.   Copies of all condominium documents including but not limited to the Articles of Incorporation, By-laws, original plans, budgets and reserve information for the last five (5) years.
9.   Copies of all Association Meeting Minutes, including but not limited to meetings held by the Board of Directors, for the past five (5) years.
10.  Copies of any and all management Agreements entered into by Banta Properties, Inc. with Westwood Apts LLC, Parkcrest Apts, Colonial Park

5

Apts or any other entity located at premises identified in the insurance contracts issued by General Star Indemnity Co. and /or Arch.

11. All appraisals of the insured property to date.

12. All documentation, including correspondence, memos, etc. exchanged between and among you, Arch or any other party excluding privileged communications, relating to this purported loss.

13. All documents reflecting the condition of the insured property before the purported loss, including, but not limited to, government inspections/citations, permits applied for and/or received, if any, and correspondence, notes and repair records regarding same.

14. All written reports (or other documentation or calculations whether printed or on disk) by any experts who has investigated any detail of the purported loss.

15. All reports prepared by any expert including any and all records, documents, correspondences, diagrams, photographs, debris samples, tests, tests results, statements, etc. regarding purported loss.

16. Any all documents such as invoices and/or proposals that describe or outline the repairs being done post-loss including but not limited for the roof replacements/repairs, all exterior repairs and all interior repairs, and a time schedule of all work to be done at the insured property.

17. All canceled checks or original receipts for all business personal property or building/premises property that you are claiming damaged, if any.

18. All receipts, invoices, estimates, etc., concerning repairs, performed or contemplated, to the insured property as a result of any damages sustained as a result of the loss claimed.

19. All documents regarding any prior insurance claims submitted by you under any property insurance coverage within the past five (5) years concerning the insured property or otherwise.

20. All estimates or other similar documentation for the replacement of items alleged to have been damaged/destroyed as a result of the loss claimed.

21. Copies of any and all deeds, titles or other documents pursuant to which you have any insurable interest in the insured property.

22. Copies of mortgages, liens or other encumbrances, upon the insured property or any other property that is the subject of your claim.

23. All monthly bank statements, canceled checks, check stubs and deposit slips or any other banking documents for the years 2003 to date, for all bank accounts of any kind of nature in which Steeplechase of Naples Condominium Association, Inc. [sic] had an interest. In the event some or all these records are not in your possession, please obtain a reproduction of the monthly bank statements and Arch will bear the reasonable cost of production.

24. All promissory notes or loans to which there was an outstanding balance at the time of the purported loss, that were given, endorsed or guaranteed by Banta Properties, Inc., these notes being in addition to and not a limitation on, other books of account or bank statements previously requested.

25. Copies of any grants or other federal or state funding provided to Banta Properties, Inc., including but not limited to any monies from FEMA, HUD or the SBA within the last five (5) years.

26. All official investigative reports relating to the loss claimed, including but not limited to, fire service, law enforcement, or other local or federal agencies that may have investigated the loss claimed.

27. All contracts or retainers with public adjusters or other entities hired by you to assist with the presentation of this claim.

28. All documentation or photographs or videotape, or any other mode of recording any prior roof leaks at the insured property and the associated damages, from January 1, 2003 through the present date.

29. Complete copies of both your file and that kept by General Star Indemnity Company including but not limited to all correspondence, payments, Statements of Loss, adjustment and investigation documents, etc.

30. All documentation of whatever nature believed to support any claim for insurance benefits for the subject loss.

23. I would assist in gathering the documents Arch requested. To the best of my knowledge, I produced any document that responded to Arch's request.

24. In regard to Arch's request for the General Star (to be obtained through an authorization signed by Banta), I understand that my attorneys requested numerous times that Arch provide any legal basis for such a request and that Arch never complied with this request. Banta nevertheless ultimately authorized the release of the General Star file to Arch on June 30, 2009.

25. Banta also sat for an examination under oath conducted by Arch on November 3, 2009. Banta was willing to resume the examination under oath immediately before and after it filed this lawsuit. I am aware that such a request was offered to Arch on October 14, 2010. Arch, however, never contacted Banta (through its attorney) to reschedule the remainder of my examination under oath.

26.     After the November 3, 2009, Examination Under Oath, Arch demanded more

documents:

1.     Lists of outside contractors
2.     Names of roofing companies that Banta Properties has used
3.     Copies of work done by S & A Glass in 2006
4.     Contract for the new roofs that were put on prior to the storm at the three properties.
5.     Maintenance records prior to the hurricane
6.     Warranties for the roofs that were replaced before the storm.
7.     Signed copies of management agreements.
8.     Management agreement for Westwood
9.     Documents responsive to Request No. 13.
10.    Documents on the roof
11.    Documents on repairs
12.    Westwood window estimate
13.    Bank inspection reports
14.    Documentation from property owners for what they paid relating to hurricane damages
15.    Fortneys bills
16.    Checks from the owners to Banta Properties.
17.    Most recent electrical documents
18.    Documents re: kitchen fires in the 210 building and 154 building
19.    Contract with Eric Raisman the public adjuster
20.    Photographs of any prior roof leaks from January 1, 2003 to present
21.    Work orders for leaks prior to the hurricane
22.    More work coming and they will send stuff as they get it

27.     I again would assist in gathering the documents Arch requested. To the best of my

knowledge, I produced any document that responded to Arch's request. In response to both

requests, Banta provided Arch all receipts, estimates, maintenance records, photographs, contractor

bids and contracts, consultant reports, bank records, credit card receipts, invoices, cancelled checks,

tax returns, and loan documentation submitted to the Small Business Administration, and the release

for the General Star file, among many other documents. In particular, Banta produced its

maintenance records prior to and after the storm. These records were comprehensive and included

hundreds of pages of work orders and a log of maintenance history. I was personally responsible

for compiling the information and Banta has not knowingly withheld any documents requested by

Arch.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 7, 2011.

Catherine M. Banta
Catherine Banta
Banta Properties, Inc.

9